UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL A. HORTON,          )     Case No. 5:09CV1737
                          )
          Petitioner,    )     JUDGE PATRICIA A. GAUGHAN
                          )
     v.                )     Magistrate Judge George J. Limbert
                          )
WARDEN,             )     **REPORT AND RECOMMENDATION**
Trumbull Correctional Institution**,**   )     **OF MAGISTRATE JUDGE**
                          )
          Respondent.    )

Pursuant to 28 U.S.C. §2254, Petitioner Michael Horton, a prisoner in custody at the Trumbull Correctional Institution, seeks review of his Stark County Ohio Court of Common Pleas conviction for one count of murder in violation of Ohio Revised Code ("O.R.C") §2903.02(a), one count of having a weapon while under disability in violation of O.R.C. §2923.13(A)(3), and one count of improperly handling a firearm in a motor vehicle in violation of O.R.C. §2923.16(A).  ECF Dkt. #1; *see also* ECF Dkt. #5, Ex. 2-5.  For the following reasons, the undersigned RECOMMENDS that the Court GRANT the instant petition and REMAND the instant case to the Stark County Ohio Court of Common Pleas for further proceedings:

**I.    SYNOPSIS OF THE FACTS**

The Fifth District Court of Appeals of Ohio set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6 th Cir. 1998), cert. denied, 119 S.Ct. 2403 (1999).  As set forth by the Fifth District Court of Appeals, the facts are:

> {¶ 2} On August 11, 2006, 18-year-old April Kienzle was celebrating her birthday. A party for Kienzle and her friend, Amanda, was planned at a house on 15th Street in the City of Canton occupied by Amanda's brother. Kienzle arrived at the party about 2:30 p.m. to help set up. There was a mix of people at the party-"older folk, younger folks, middle-age folks." Among the partygoers were the Delgado brothers, James and Jesse,

Perry Carlisle, Coty Cricks and Ricky Joiner.

{¶ 3} Later that day, appellant called Kienzle on her cell phone and asked her to come meet him. Kienzle dated appellant for about a year before the party. Kienzle told appellant she could not meet him because she was at the party drinking beer and doing shots. Appellant then told Kienzle he wanted to see her. Kienzle checked with Amanda, Joiner, the Delgado Brothers and others, asking them if they had a "problem if Mike came over?" Kienzle then told appellant he could come over, that "nothing was going to happen" and gave him directions to the party.

{¶ 4} Appellant asked his friend, Mario Carbenia, if he would drive him to the party offering him $10.00 for gas. Carbenia had use of his cousin's green Ford Explorer that day and agreed to take appellant to the party. Appellant took a .40 caliber semiautomatic handgun with him to the party, tucked in his pants at the belt line. On the way over to the party, Carbenia and appellant were lost and called Kienzle for additional directions. By the time the pair arrived at the party it was dark. Carbenia pulled the Explorer over to the south side of the road across from the party house. Carbenia left the Explorer's motor running. There were 10 to 14 people on the porch. Appellant called Kienzle on his cell phone and told her he was outside. Kienzle came out of the house with two other girls and went to the passenger side of the Explorer next to the curb to talk to appellant. Appellant remained in the car and the couple exchanged greetings. Kienzle saw the handgun tucked in appellant's pants and told him "if he was going to start anything, he could go ahead and leave because we weren't having that." One of the girls standing by the Explorer with Kienzle left and went back into the home.

{¶ 5} While Kienzle and appellant were talking, Coty Cricks came up to the driver's side window, looked in and walked over to Kienzle, saying "[I]s this who I'm supposed to be holding Ricky back from?" Hearing this, Carbenia tapped appellant on the chest saying, "something's wrong, let's go." Appellant and Carbenia did not leave.

{¶ 6} Joiner, Jesse Delgado and Perry Carlisle went out to the Explorer. Joiner ran up to the passenger side window and reached inside the vehicle. Kienzle heard some yelling and then a gunshot. Joiner fell to the ground and the Explorer pulled off.

{¶ 7} After the shooting, there was a lot of screaming and panic-"millions of people running around and screaming. Kienzle and her girlfriend left in a car and went to the home of Carol Kemp. They were hysterical, screaming and saying, "we just saw somebody get shot in the head." Kemp called 911. A detective called her back and asked her to send the girls down to the police station to make a statement. Kemp overheard Kienzle talking on her cell phone saying, "It was my fault because I got him there."

{¶ 8} The Delgado brothers, Cricks and Carlisle went to the aid of Joiner. They were holding Joiner who had been shot in the left cheek. Cody Cricks put a shirt over Joiner's face and put pressure on the gunshot wound. The paramedics were dispatched at 11:32 pm. They found Joiner lying on the ground with a gunshot would to his head under his left eye. About 15 minutes later, they arrived at Aultman Hospital. Joiner was pronounced dead of a gunshot wound in the emergency room of the hospital.

{¶ 9} After appellant shot Joiner, Carbenia "took off" in the Explorer. When they got down the street, Carbenia testified that there was a clear beer bottle on appellant's lap. Appellant threw the bottle out the window. Carbenia asked appellant what happened to the expelled bullet jacket and appellant told him it was still in the gun. Appellant took off his shirt and directed Carbenia to the home of his girlfriend in East Canton,

Anna Rukavina. Appellant and Carbenia arrived around midnight. Appellant took Rukavina in the bedroom and told her that he thought he killed someone. Appellant told her that the truck he was riding in was surrounded by fifteen people and that he shot out the window to back everyone away from the truck. He was wearing a grill on his front teeth and complained that it felt different. Appellant told Rukavina that he had been hit in the mouth with a beer bottle.

{¶ 10} Appellant stayed the night with Rukavina. The next morning about 5:30 a.m., Rukavina received a call from Joiner's cousin who told her that appellant had killed Joiner. Rukavina later received calls that there were people out looking for appellant. Rukavina told appellant about the telephone calls.

{¶ 11} A day after the shooting, appellant, accompanied by his mother, turned himself in to authorities at the Stark County Sheriffs Department.

{¶ 12} Detective Vic George of the Canton Police Department was assigned to investigate the shooting of Joiner. George interviewed witnesses and learned the name of a suspect, Michael Horton, Jr. Detective George learned that appellant had turned himself in and went out to the Stark County Jail to interview him. Detective George observed no injuries on appellant and appellant complained of none. Appellant told Detective George it [the shooting] wasn't his fault-that it was an accident. Appellant further told Detective George that Joiner struck him in the face with a clear colored beer bottle. When that happened, he pulled a gun out of the waistband of his pants with his left hand and drew his arms across his chest to fire it out the window to scare off the person. Detective George asked appellant about the gun. Appellant responded that it was in a safe place.

{¶ 13} Detective George was unable to locate the beer bottle where appellant said he threw it. The gun was not found.

{¶ 14} The Chief Deputy Coroner, P.S. Murthy, performed an autopsy on Joiner's body. Doctor Murthy noted that Joiner was an 18-year-old "very healthy young man." Doctor Murthy first observed a lot of blood and a gunshot wound in the region of the left face. He saw a grazing wound on the left side of the nostril. Doctor Murthy also observed a prominent area of stippling on the face. Doctor Murthy described stippling as "when a firearm is discharged, burnt powder and then unburnt power is discharged from the firearm; and this unburnt gunpowder particles make small punctate reddish brown marks on the body and the skin surface." There were also areas of stippling on Joiner's right forearm. The presence of stippling can indicate how far the muzzle of the gun was from the skin surface. From the presence of the stippling, Doctor Murthy was able to opine that the gun was fired 1-1/2 to 3 feet from Joiner's face and cheek. Doctor Murthy also opined that the stippling on Joiner's right forearm was caused when Joiner attempted to deflect the gun.

{¶ 15} Based on his examination of the brain, Doctor Murthy was able to determine that the bullet traveled through Joiner's skull essentially pulverizing it-pulpefaction. The brain was torn into small pieces and became a soupy type of material. Joiner died from hemorrhaging of the brain caused by a gunshot wound to the face.

{¶ 16} Doctor Murthy was able to collect some bullet fragments from the brain; the lead core of the bullet, two large fragments and the copper jacket. Those fragments were turned over to the Stark County Crime Laboratory for analysis.

{¶ 17} Dennis Florea, firearms expert, examined the bullet fragments and copper jacket. From that examination, Florea was able to determine that the bullet was fired

from a firearm having six lands and grooves with a right twist. Glock Firearms, Heckler & Koch Firearms, Israeli Military Industries or IMI, and Kahr Firearms produce such a firearm. Florea examined the coroner's pictures of Joiner's body and noted the stippling on his face. Florea opined that the muzzle of the firearm was held 12 to 18 inches from Joiner's cheek when it was fired.

{¶ 18} Prior to trial, appellant plead guilty to having weapons while under disability and sentencing was deferred until the end of the trial.

{¶ 19} At the conclusion of the evidence, appellant requested instructions on selfdefense [sic], negligent homicide, reckless homicide and involuntary manslaughter. Those requests were denied by the trial court.

{¶ 20} The jury found appellant guilty of the crimes as charged in the indictment including the crime of murder.

{¶ 21} On February 20, 2007, appellant returned to the trial court and was sentenced to fifteen years to life on the count of murder, a five-year term for the merged firearm specifications, a five year term for having a weapon while under a disability and an eighteen month prison term for improper handling of a firearm. Appellant received an aggregate prison sentence of life with parole eligibility in twenty-five years.

ECF Dkt. #5, Ex. 9 at ¶¶2-21.

## II.      PROCEDURAL HISTORY

### A.      State Court Conviction

On October 2, 2006, the prosecuting attorney for Stark County Ohio filed an indictment charging Petitioner with one count of murder in violation of O.R.C. §2903.02(a), one count of having a weapon while under disability in violation of O.R.C. §2923.13(A)(3), and one count of improperly handling a firearm in a motor vehicle in violation of O.R.C. §2923.16(A). ECF Dkt. #5, Ex. 1. On February 13, 2007, Petitioner entered a plea of guilty to having a weapon while under disability. ECF Dkt. #5, Ex. 2. The case proceeded to a jury trial and on February 16, 2007, a jury found Petitioner guilty of the remaining claims in the indictment. ECF Dkt. #5, Ex. 3. On February 26, 2007, the trial judge sentenced Petitioner to an aggregate term of 25 years to life in prison. ECF Dkt. #5 Ex. 4, 5.

### B.      Ohio Court of Appeals

On March 20, 2007, Petitioner, through counsel, filed a notice of appeal to the Ohio Court of Appeals for the Fifth District. ECF Dkt. #5, Ex. 6. On June 7, 2007, Petitioner filed an appellate brief alleging the following assignments of error:

I.      THE TRIAL COURT'S FINDING OF GUILT IS AGAINST THE MANIFEST

-4-

WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

II.    THE APPELLANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND OF ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

III.    THE APPELLANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS BY THE MISCONDUCT OF THE PROSECUTOR.

IV.    THE TRIAL COURT ERRED BY REFUSING TO INSTRUCT THE JURY AS TO APPROPRIATE LESSER INCLUDED OFFENSES.

V.    THE TRIAL COURT ABUSED ITS DISCRETION BY IMPROPERLY IMPEDING THE APPELLANT'S ABILITY TO CROSS EXAMINE THE STATE'S WITNESSES.

ECF Dkt. #5, Ex. 7.

On December 3, 2007, the Ohio Court of Appeals affirmed Petitioner's conviction. ECF Dkt. #5, Ex. 9.

**C.    Supreme Court of Ohio**

On January 24, 2008, Petitioner filed a notice of appeal to the Supreme Court of Ohio. ECF Dkt. #5, Ex. 10. Petitioner filed a memorandum in support of jurisdiction, raising the following propositions of law:

1.    Where the evidence in a murder trial would support an acquittal on the murder and a conviction [sic] one or more lesser or inferior offenses, a criminal defendant is deprived of due process where the trial court refuses to instruct the jury on the lessor or inferior offenses. Fifth and Fourteenth Amendments to the United States Constitution, and Section 10, Article I of the Ohio Constitution.

2.    A conviction absent proof beyond a reasonable doubt of every element of the offense charged deprives a defendant of his constitutional right to due process of law. *Jackson v. Virginia* (1979), 445, U.S. 307; Fifth and Fourteenth Amendments to the United States Constitution, and Section 10, Article I of the Ohio Constitution.

ECF Dkt. #5, Ex. 11 at i.

On June 9, 2008, the Supreme Court of Ohio dismissed the appeal as not involving a substantial constitutional question. ECF Dkt. #8, Ex. 13.

**D.    Federal Petition for Writ of Habeas Corpus**

On July 27, 2009, Petitioner, through counsel, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. ECF Dkt. #1. Petitioner raises the following ground for relief:

-5-

Ground One: Where the evidence in a murder trial would support an acquittal on the murder and a conviction of one or more lesser or inferior offenses, a criminal defendant is deprived of due process where the trial court refuses to instruct the jury on the lesser or inferior offenses. Fifth and Fourteenth Amendments to the United States Constitution.

Supporting Facts:

On August 11, 2006, Michael Horton called April Kienzle to ask her to come meet him. Kienzle declined his invitation because she was celebrating her birthday at a party. Horton asked if he could come to the party and Kienzle said yes.

Horton arrived at the party in the passenger seat of a friend's Ford Explorer. He had a 40-caliber semiautomatic tucked in his pants at the belt line. Kienzle came to the SUV with two other girls and greeted Horton at the passenger side of the Explorer. While Kienzle and Horton chatted, a man named Coty Cricks came up to the driver's side window, looked in, and asked Kienzle, "Is this who I'm supposed to be holding Ricky back from?" Horton's friend suggested they should leave, but Horton continued talking to Kienzle. Cricks was soon joined by four other men, including Ricky Joiner. Joiner ran up to the passenger side window and reached inside the vehicle. Kienzle testified that she heard yelling and then a gunshot. Joiner fell to the ground and the Explorer pulled off.

Horton went to his girlfriend's home and told her that he thought he killed someone. He told her that his truck had been surrounded by fifteen people and that he shot out the window to back everyone away from the truck. Horton said that his front teeth felt different and that he had been hit in the mouth with a beer bottle. At trial, the driver of the Explorer testified that after the shooting, he saw a clear beer bottle in Horton's lap.

Early the next morning, Horton learned that Joiner was dead. Accompanied by his mother, he turned himself into police. He told police that he had not meant to kill Joiner. When Joiner struck him in the face with a beer bottle, Horton recounted, he fired the gun out the passenger window to back Joiner away from the vehicle.

Because much of the evidence presented would support a jury's finding of not guilty of murder and guilty of a lesser or inferior offense, the defendant requested instructions on self-defense, negligent homicide, reckless homicide, and involuntary manslaughter. The trial court declined to give these instructions and Horton was convicted of murder.

ECF Dkt. #1.

On November 4, 2009, Respondent filed a return of writ. ECF Dkt. #5. On January 27, 2010, Petitioner filed a traverse. ECF Dkt. #9.

## III.     PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a writ of federal habeas corpus. As Justice O'Connor noted in *Daniels v. United*

-6-

*States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

Respondent does not contend that the instant petition is time-barred. ECF Dkt. #5 at 7. Further, Respondent contends that parts of Ground One are procedurally barred, but Respondent concedes that petitioner's claim related to self-defense is available for habeas review. *Id.* at 10-13. Petitioner has elected only to proceed with his claim that the state court of appeals unreasonably applied *California v. Trombetta*, 467 U.S. 479 (1984) when it held that he failed to present sufficient evidence to support a self-defense instruction. ECF Dkt. #9 at n. 1. Therefore, the undersigned will not address procedural bars any further.

## IV.    STANDARD OF REVIEW

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998). Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus. The AEDPA provides:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)    resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

Under the "contrary to" clause, a federal habeas court may grant the writ if the state

-7-

court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.*  Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A.  Decisions of lower federal courts may not be considered.

B.  Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C.  The state court decision may be overturned only if:

  1.  It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

  2.  the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

  3.  'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

  4.  the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

-8-

D.      Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' 'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.      Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986). The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e). The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact. *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993). The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997). Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law. *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## V.      ANALYSIS

Petitioner contends that trial counsel requested an instruction on self-defense, the trial court

refused, and Petitioner was therefore denied due process under the Fifth and Fourteenth Amendments.  ECF Dkt. #9 at 9 citing *Trombetta*, 467 U.S. at 485. Respondent contends that this claim is not cognizable as an issue of state law.  ECF Dkt. #5 at 13.  Respondent further contends that Petitioner did not present sufficient evidence to warrant a self-defense instruction.  *Id*. at 16-18.

The Court should first identify any clearly established federal law, as determined by the Supreme Court of the United States, which may apply to this case.  28 U.S.C. §2254(d)(1).  In *Trombetta*, the United States Supreme Court held as follows:

> Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness.  We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense.

*Trombetta*, 467 U.S. at 485.  The undersigned acknowledges Respondent's contention that the instant claim is non-cognizable.  ECF Dkt. #5 at 13-18.  However, the undersigned believes that Respondent fails to differentiate a claim based purely on state law from the high burden that must be satisfied to demonstrate a constitutional violation arising from an error of state law.  *See Cupp v. Naughten*, 414 U.S. 141, 147 (1973) ("the question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."); *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.1983) ("[E]rrors in application of state law, especially with regard to the admissibility of evidence, are **usually** not cognizable in federal habeas corpus.) (emphasis added); *Bey v. Bagley*, 500 F.3d 514, 519-520 (6th Cir. 2007):

> Bey's second claim is that, even though the Ohio Supreme Court upheld the admission of the 'other acts' evidence as a matter of state evidentiary law, that particular evidence was so prejudicial that its admission nonetheless rendered his entire trial fundamentally unfair, **which denied him due process under the Fifth and Fourteenth Amendments. This is Bey's new construction of his proposed habeas issue and by framing it as a constitutional violation he has at least asserted a cognizable habeas claim** . . .

(emphasis added).  Here, Petitioner's claim is cognizable because he alleges that he was denied his constitutional right to due process when the trial court issued a ruling that prevented him from presenting a complete defense.  Thus, the question in this case is not one of cognizablity, but whether

-10-

Petitioner has met the burden of showing that an error of state law has resulted in a denial of a federal constitutional right.

"The due process rights of an accused have been adequately protected if he has been given the opportunity to present his defense, to cross examine witnesses and to present testimony." *Allen v. Morris*, 845 F.2d 610, 615 (6th Cir. 1988). This case raises questions as to whether Petitioner was foreclosed from arguing his theory of self-defense to the jury and whether the jury was prevented from considering self-defense as an option when rendering a verdict. "[T]he right of a defendant in a criminal trial to assert self-defense is one of those fundamental rights, and that failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause." *Taylor v. Withrow*, 288 F.3d 846, 851 (6th Cir. 2002). However, "[t]he failure to give a requested self defense instruction . . . does not deprive the defendant of his constitutional right to due process if the evidence produced during trial was insufficient to warrant such an instruction." *Id*. at 617. To assess whether the evidence adduced at trial was sufficient to support a self-defense instruction, the Court must look to the elements of self-defense in Ohio.

Under Ohio law, a defendant may assert an affirmative defense of self-defense by showing the following elements: (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger. *State v. Melchior*, 381 N.E.2d 195, 199 (Ohio 1978) (internal citations omitted). Petitioner and Respondent agree that this is the appropriate standard for self-defense. ECF Dkt. #5 at 17; #9 at 6. This is the standard that the appellate court applied in this case. ECF Dkt. #5, Ex. 9 at ¶109.

In this case, trial counsel requested a self-defense instruction before the judge charged the jury. Tr. at 806. Trial counsel argued that there was testimony that the victim was seen with a hand or an arm inside the vehicle and the gun was fired from a sitting position in the car. *Id*. at 807. He further argued that Petitioner himself was not required to testify. *Id*. at 807. Lastly, he argued that

-11-

there was evidence that a beer bottle struck Petitioner in the mouth.  *Id.* at 807-08.  The trial judge

ruled as follows, "The Court does not find that there is sufficient evidence to support an instruction

on self-defense."  *Id.* at 808.

> On appeal, the Fifth District Court of Appeals held as follows:
>
> In the case at bar, appellant simply did not present sufficient evidence in this case that would enable a juror to reasonably believe that appellant had a bona fide belief that he was in imminent danger of death or great bodily harm from either the decedent or anyone else, or that any of the individuals at the party were involved in any common scheme or plan to rob and assault the appellant, that warranted appellant's use of deadly force to defend himself against the decedent. In fact, such an argument runs counter to appellant's statement to the police that the shooting was accidental. Finally, appellant was seated inside a motor vehicle parked on the street with the motor running. There is no evidence to suggest that appellant was impeded from simply driving away from the party.
>
> The evidence presented was insufficient to support a self-defense instruction with respect to appellant's shooting of Mr. Joiner, and the trial court did not abuse its discretion by refusing to instruct the jury on that issue.

ECF Dkt. #5, Ex. 9 at ¶¶ 111-12.

The trial court's ruling provides no basis for meaningful review.  Therefore, the Court is

restricted to a review of the appellate court's decision to determine if it is contrary to or an

unreasonable application of federal law.  On review of the appellate court's decision, the undersigned

recommends that the Court find that the decision constituted an objectively unreasonable application

of federal law because the legal conclusions plainly contradict the factual findings in the opinion and

resulted in the state court preventing Petitioner from presenting a defense that he was entitled to as

a matter of due process.

First, the appellate court held that there was insufficient evidence to enable a juror to

reasonably believe that appellant had a bona fide belief that he was in imminent danger of death or

great bodily harm from either the decedent or anyone else.  ECF Dkt. #5, Ex. 9 at ¶111. The appellate

court noted that "Joiner ran up to the passenger side window and reached inside the vehicle."  *Id.* at

¶6; *see also* Tr. at 409 (Ms. Kienzle testified: "I saw [Joiner] come running up from behind the car

to the window. **Q:** Where did he go? **A:** Straight to the window. **Q:** What happened when he got

there? **A.** He like reached in the window.").  Additionally, there was evidence that Petitioner was struck in the face with a beer bottle.  Tr. at 539; 568, 575, 711-12, 716-17.  The appellate court specifically acknowledged some of this evidence.  ECF Dkt. #5, Ex. 9 at ¶9 (the appellate court acknowledged that "Carbenia testified that there was a clear beer bottle on appellant's lap. [and] Appellant threw the bottle out the window. . . .Appellant told [his girlfriend] that he had been hit in the mouth with a beer bottle."); ECF Dkt. #5, Ex. 9 at ¶13 ("Appellant further told Detective George that Joiner struck him in the face with a clear colored beer bottle.  When that happened, he pulled a gun out of the waistband of his pants with his left hand and drew his arms across his chest to fire it out the window to scare off the person.").

In a recent case, Fifth District Court of Appeals, the same appellate court that found Petitioner had no bona fide belief of imminent danger of death, noted that "A beer bottle and/or a beer mug or glass has been found to be a deadly weapon in numerous cases. "  *State v. Moody*, Case No. 09 CA 90, 2010 WL 2726165 at ¶41 (Ohio App. 5 Dist., July 12, 2010), slip op. (collecting cases); *see also State v. Ford*, 1989 WL 61753 at *2 (Ohio App 10th Dist. May 6, 1989), unreported (glass beer mug can be a deadly weapon).  The *Moody* court also explained:

> An item does not have to be one that kills in order to be a deadly weapon. *In re Smith* (2001), 142 Ohio App.3d 23, 24. No item, no matter how small or commonplace, can be safely disregarded for its capacity to cause death when it is wielded with the requisite intent and force. *Id.*, citing *State v. Deboe* (1977), 62 Ohio App.2d 192, 193-194. The use of a piece of wire fashioned to a sharp point as a weapon has been found to support a conviction for felonious assault. *State v. Quinones* (Jan. 22, 1990), Richland App. No. CA-2687. *See, also, In re Smith*, supra (a ballpoint pen could be used as a deadly weapon); *State v. Hicks* (1984), 14 Ohio App.3d 25, 26, 469 N.E.2d 992 (a toy gun is capable of inflicting death because of its possible use as a bludgeon).

*Moody*, 2010 WL 2726165 at ¶40.  As noted above, the appellate court recognized testimony was presented showing that Mr. Joiner ran up to the passenger side of the vehicle, he reached inside, Mr. Carbenia observed a beer bottle on Petitioner's lap after the shooting, and Petitioner claimed to have been struck by a beer bottle.  If the jury believed this testimony, it could have supported a finding that Petitioner has a bona fide belief that he was in imminent danger of death or great bodily injury.  However, this issue was never submitted to a jury for a determination.

-13-

The undersigned recommends that the Court find the appellate court's unreasonably applied federal law in denying Petitioner an opportunity to present his defense.  At the time of Petitioner's conviction, Ohio had ample precedent showing that a beer bottle can be a deadly weapon, the appellate court acknowledged evidence of record that could show that Joiner ran up to the vehicle and that Petitioner was struck with a beer bottle.  Nevertheless, the court determined that there was insufficient evidence for a jury to reasonably believe that appellant had a bona fide belief that he was in imminent danger of death or great bodily harm.

It is possible that the jury disbelieved that Petitioner was assaulted with a beer bottle or had an apprehension of imminent danger of death or great bodily harm.  The undersigned acknowledges Ohio law, which provides that remand is not necessary, even if a self-defense instruction should have been given, where it is apparent from the record that the jury disbelieved the defendant's claim of self-defense.  *State v. Jackson*, 490 N.E.2d 893, 896-98 (Ohio1986).  The undersigned questions the extent to which this holding in *Jackson* is binding on this Court in the consideration of a federal due process claim.  Nevertheless, the undersigned notes that *Jackson* is distinguishable from the case at bar.  In *Jackson*, the trial court gave a general instruction on self-defense but declined to give a special instruction on the duty to retreat from a home or business.  Although the Supreme Court of Ohio noted that "[t]he weight to be given evidence and the credibility of the witnesses are primarily decisions for the jury," the court ultimately held that remand was not necessary because "the jury simply rejected appellant's theory of self-defense."  *Id*. at 897.  After noting that the defendant "told the jury that he feared the victim was going to kill him and shot only in self-defense," the *Jackson* court held that "it is apparent from the verdict that the jury believed the testimony of the state's witnesses that appellant did not believe he was in imminent danger of death or great bodily harm from the victim. This testimony showed that appellant acted out of jealous anger toward the victim rather than out of fear for his life. "  *Id*. at 884-85, 887.

Unlike *Jackson*, the jury in this case received no instruction on self-defense.  Therefore, this Court has no assurances that the jury rejected Petitioner's claims of apprehension, inability to flee, or his belief that the use of deadly force was necessary.  Admittedly, a detective testified that he was

unable to locate the beer bottle where appellant said he threw it.  ECF Dkt. #5, Ex. 9 at ¶13.  And, the jury could have disbelieved the testimony from Mr. Carbenia, Ms. Kienzle, and Ms. Rukavina regarding the beer bottle and Mr. Joiner running up to the vehicle.  However, the Court cannot determine what conclusions the jury reached regarding this evidence because the trial judge instructed the jury only on murder. Tr. at 880-81.  Under the trial judge's instructions, the jury was to consider only whether Petitioner intended to kill Mr. Joiner:

> Before you can find the Defendant guilty, you must find that beyond a reasonable doubt that on or about the eleventh day of August, 2006, in Stark County, Ohio, Michael Anthony Horton, Jr., purposely caused the death of Rick E. Joiner.
>
> *        *        *
>
> Purposely.  Purpose to cause death is an essential element of the crime of murder.  A person acts purposely when it is his specific intention to cause a certain result.
>
> It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to cause the death of Rick E. Joiner.
>
> Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in a specific conduct.  To do an act purposely is to do it intentionally and not accidentally.  Purpose and intent mean the same thing.
>
> The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.
>
> The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapons used, and all the other factors and circumstances in evidence.
>
> If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon.
>
> Proof of motive is not required.  The presence or absence of motive is one of the circumstances bearing upon purpose.

Tr. at 880-83.  Based on these instructions, it would be entirely possible for a reasonable jury to find that Petitioner committed murder by intentionally killing Mr. Joiner and at the same time find that he acted in self-defense because he believed that he was in imminent danger of death or great bodily

-15-

harm and his only means of escape was to use deadly force. However, under the trial judge's instructions, the jury was to return a verdict of guilty if Petitioner intentionally killed Mr. Joiner. Although the instructions did not explicitly direct so, they permitted (and arguably directed) the jury to find Petitioner guilty of murder even if the jury believed that Petitioner acted in self-defense. Thus, the jury's finding in this case does not demonstrate that the jury either believed or disbelieved Petitioner's account of the events or his claim of a belief of imminent danger.

Despite evidence that could support a finding of Petitioner's apprehension, the jury in this case was not given the option to make a finding regarding self-defense. Therefore, Petitioner was denied an opportunity to present a complete defense in violation of his right to due process. *See Trombetta*, 467 U.S. at 485; *Allen*, 845 F.2d. at 615-17.

Next, the undersigned considers the appellate court's finding that Petitioner's assertion of self-defense "runs counter to [his] statement to police that the shooting was accidental." ECF Dkt. #5, Ex. 9 at ¶111. The undersigned fails to see an inconsistency because the test for self-defense inquires as to the defender's "bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in **the use** of such force." *Melchior*, 381 N.E.2d 199 (emphasis added). The undersigned is not aware of any requirement that the defender actually intended to kill the aggressor, as opposed to merely intending to **use** lethal force in an effort to defend himself.

The appellate court characterized the testimony as showing that Petitioner told police that "the shooting was accidental," (ECF Dkt. #5, Ex. 9 at ¶111) but state witness Detective Victor George testified that Petitioner fired the gun to "scare off" the person who hit him with a beer bottle. Tr. at 539. Petitioner did not contend that his act of shooting the gun was accidental; he claimed only that killing Mr. Joiner was an accident. *Id*. Thus, there was evidence adduced to show that Petitioner intentionally used deadly force in an effort to protect himself; he admitted to intentionally firing the gun. The inquiry regarding an intent to use force for personal protection (as opposed to the intent to kill the assailant) is the pertinent inquiry under the second *Melchior* factor, which the appellate court cited in this very case. Therefore, the evidence was sufficient to warrant a self-defense instruction.

-16-

The appellate court found sufficient evidence to support a murder charge, reasoning that "[T]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." ECF Dkt. #5, Ex. 9 at ¶38. Petitioner was not required to negate this intent to establish self-defense. The Supreme Court of Ohio has held that "[s]elf-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged." *State v. Martin*, 488 N.E.2d 166, 168 (Ohio 1986). "[T]his defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability." *Id*. That is precisely the essence of the testimony of state witness Detective Victor George. *See* Tr. at 539. Detective George testified that Petitioner told him that he fired the gun in order to "scare off" the person at the passenger window. *Id*. The appellate court acknowledged this testimony.[1] If Petitioner fired the gun to "scare off" the person, then he obviously admitted to intentionally firing the weapon. Thus, he admitted to the actus reus for murder. ECF Dkt. #5, Ex. 9 at ¶38. The question that the appellate court plainly ignored is whether Petitioner used deadly force based upon a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape was in the use of such force. *See Melchior,* 381 N.E.2d at 199.

The appellate court held that it was appropriate to infer an intent to kill from the act of intentionally firing a gun. Although the appellate court acknowledged Detective George's testimony, the court failed to apply it under the second prong of the *Melchior* test to consider that the testimony could support a finding that Petitioner intentionally fired the gun to "scare off" the person in the window.

---

[1]     The appellate court summarized Detective George's testimony:

> Appellant told Detective George it [the shooting] wasn't his fault–that it was an accident. Appellant further told Detective George that Joiner struck him in the face with a clear colored beer bottle. When that happened, he pulled a gun out of the waistband of his pants with his left hand and drew his arms across his chest to fire it out the window to scare off the person.

ECF Dkt. #5, Ex. 9 at ¶12.

In this case, it was objectively unreasonable to hold Petitioner accountable for the intentional act of pointing a gun and pulling a trigger as evidence of sufficient mens rea for murder, but not to submit his claim of self-defense to the jury to determine if he was prompted by an imminent fear of death or serious bodily injury when he committed the very same act of pointing the gun and pulling the trigger purportedly for self-protection.  Testimony showed that Petitioner admitted to firing the gun, as is proper when asserting self-defense.  *Martin*, 488 N.E.2d at 168.  The evidence showed that he intended to **use** deadly force, and that is all that he was required to show.  Evidence was introduced to show that Petitioner's act of firing the gun was intentional, and that was the basis upon which the appellate court affirmed his conviction.  Having found a basis for the jury to find his act of firing the gun to be intentional, the appellate court should have been compelled to remand the case to the trial court for a consideration of self-defense.  Ultimately, these errors resulted in the deprivation of a constitutional due process right to present a complete defense.

Lastly, the appellate court reasoned that "[t]here is no evidence to suggest that appellant was impeded from simply driving away from the party."  ECF Dkt. #5, Ex. 9 at ¶111.  In arguing that the appellate court did not act unreasonably, Respondent does not even go as far as the appellate court.  He contends that Petitioner's "only means of escape was not by using force because he was sitting in a vehicle, and the engine was still on at the time that the defendant shot the victim.  As a result, Horton could have escaped by fleeing in the vehicle, instead of using force because no evidence was presented to suggest that appellant was hindered from driving away from the party."  ECF Dkt. #5 at 17-18.  Neither the appellate court nor Respondent acknowledge that evidence showed Petitioner was not in control of the vehicle and possibly was not able to exit it safely.  He was in the front passenger seat (ECF Dkt. #5, Ex. 9 at ¶4; Tr. at 729), Mr. Carbenia was driving the vehicle (ECF Dkt. #5, Ex. 9 at ¶4; Tr. at 712), and Mr. Joiner was reaching in the passenger window (ECF Dkt. #5, Ex. 9 at ¶6).  With Petitioner apparently in the passenger seat, between the driver and Mr. Joiner, the appellate court determined that there was "no evidence" to suggest that Petitioner could have "simply [drove] away from the party."  ECF Dkt. #5, Ex. 9 at ¶111.

There is no evidence that he could have reasonably exerted either actual or constructive

control over the vehicle during the time of the shooting.  Contrary to the appellate court's conclusion, there is no evidence that Petitioner himself could have driven the car away from the scene.  Again, the evidence showing that Petitioner lacked actual control over the vehicle is found directly in the appellate court's decision.  (ECF Dkt. #5, Ex. 9 at ¶¶4, 6 (acknowledging his position between the driver and Mr. Joiner)).  Further, it is questionable that Petitioner could have instructed Mr. Carbenia to drive away since Mr. Carbenia himself testified that he had difficulty getting the vehicle into gear. Tr. at 712.[2]  In any event, Mr. Carbenia's account of the events could be assessed by a jury, if necessary.

In *State v. Marsh*, 593 N.E.2d 35, 36 (Ohio App. 11 Dist.,1990), the Eleventh District Court of Appeals held that the failure to instruct a jury on self-defense was plain error where a motor vehicle was not a reasonably available means of escape.  In *Marsh*, a defendant was in a campsite with his family when he flagged down a sheriff's patrol car about boisterous neighbors.  *Id*.  After the patrol car left, the neighbors began to threaten the defendant and his family.  *Id*.  His family ran to their van and it would not start.  *Id*.  The defendant responded by exiting his tent, where he was punched in the face and further threatened.  *Id*.  The defendant stabbed the aggressor with a fishing knife.  *Id*.  The appellate court noted that the defendant heard the sound of the engine in the van grinding but refusing to start.  *Id*. at 37.  The court concluded:

> Under these circumstances, if the jury believed appellant's testimony, it could have found that appellant was acting in defense of his family when he left his tent, picked up his fishing knife, and walked around to the back of his tent. The jury was not

---

2      The undersigned acknowledges that an argument could be made that Petitioner exercised constructive control over the vehicle by offering to pay Mr. Carbenia $10.00 for gas in order to drive him to the party.  *See* ECF Dkt. #5, Ex. 9 at ¶4.  However, the probative question here is whether Petitioner reasonably believed he had no ability to control the vehicle at the time of the affray.  *See Melchior*, 381 N.E.2d at 199; *Marsh*, 593 N.E.2d  at 36.  To the extent that his payment to Mr. Carbenia can be considered an exercise of control over the vehicle, that evidence should be available only to attack the weight of his affirmative defense and should not wholly prevent him from presenting the defense to the jury.  *See  State v. Jackson*, N.E.2d at 897 ("The weight to be given evidence and the credibility of the witnesses are primarily decisions for the jury.").  As noted in the text above, the jury was not instructed on self-defense and was not required to make a finding regarding Petitioner's belief that a reasonable escape existed.  Since the initial jury never needed to consider the issue regarding Petitioner's belief that he had the ability to control the vehicle and evidence exists to support a finding that Petitioner did not control the vehicle, that issue should be submitted to a jury on remand.

> instructed, however, on the defense of one's family. The failure to instruct on defense of family was plain error.

*Id*. at 38. Like the vehicle in *Marsh* was not an available means of escape because it was inoperable, the vehicle in this case was not a means of escape because there was no evidence that Petitioner was able to exercise control over it to effect a reasonable escape from any perceived danger.  Evidence was introduced at trial and cited by the appellate court showing that Petitioner was in the passenger seat, Mr. Carbenia was in the driver's seat, and Mr. Joiner was reaching in the passenger side window.  ECF Dkt. #5, Ex. 9 at ¶¶4, 6.  Nevertheless, the appellate court concluded that Petitioner could have "simply driv[en] away".  This conclusion is objectively unreasonable and by affirming the trial court, it prevented Petitioner from presenting his defense to the jury in violation of his right to due process.

Returning to the test articulated in *Melchior*, it appears to be undisputed that there was evidence to show that evidence was introduced to support the first prong.  Evidence could support a finding that Petitioner was not at fault for creating the situation giving rise to the affray – he sat in the passenger seat as Mr. Joiner ran up to the vehicle.  Turning to the second prong, evidence can support a finding that Petitioner had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape was in the use of such force – he was between Mr. Carbenia and Mr. Joiner and had been struck in the mouth with a beer bottle.  With regard to the third prong, evidence can support a finding that Petitioner did not violate any duty to retreat or avoid danger – Petitioner could not drive the car away or exit through the passenger door.  Because the appellate court acknowledged these facts in its decision but affirmed the trial court's denial of a self-defense instruction, the undersigned recommends that the Court find that the appellate court unreasonably applied federal law, and consequently denied Petitioner's due process right to present a complete defense for a jury's consideration.

Petitioner should be granted a writ of habeas corpus and his case should be remanded to the Stark County Court of Common Pleas for a new trial.  However, the undersigned recommends that the Court deny habeas relief pertaining to Petitioner's conviction and sentence for Having a Weapon

While Under Disability in violation of O.R.C. §2923.13(A)(3).  Petitioner's conviction on this count was the result of a guilty plea and is not attributable to a trial court error related to jury instructions. ECF Dkt. #5, Ex. 2.  This crime was completed before Petitioner shot Mr. Joiner.  Therefore, a claim of self-defense is not available for this charge. Petitioner was sentenced to a 5 year consecutive term for this charge.  ECF Dkt. #5, Ex. 4, 5.  Petitioner should remain incarcerated for this conviction.

## VI.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned RECOMMENDS that the Court GRANT the instant petition, limited to the conditions set forth in this report and recommendation, and REMAND Petitioner's case to the Stark County Court of Common Pleas for a new trial on the charges of murder in violation of O.R.C §2903.02(a) and improperly handling a firearm in a motor vehicle in violation of O.R.C. §2923.16(A).


DATE: October 14, 2010                          */s/  George J. Limbert*
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).